UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELROSE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 02-1161 |
| | ) | |
| CITY OF PITTSBURGH, CITY OF | ) | Judge Joy Flowers Conti |
| PITTSBURGH ZONING BOARD OF | ) | Magistrate Judge Amy Reynolds Hay |
| ADJUSTMENT, CLIFFORD B. | ) | |
| LEVINE, ESQ., REGIS D. MURRIN, | ) | |
| ESQ., and JESSE W. FIFE, JR., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Melrose, Inc. ("Melrose" or "the Plaintiff"), a Pennsylvania corporation engaged in the

business of acquiring and leasing naming rights to buildings in the City of Pittsburgh, filed suit

alleging that the Defendants violated its First and Fourteenth Amendment rights by arbitrarily

denying Melrose permits to display signs on buildings for which it held the naming rights.  The

denials were based on the conclusion of the Pittsburgh Zoning Board of Adjustment ("the

Board") that the signs were not bona fide identification signs within the meaning of the

Pittsburgh Zoning Code ("the Code"), but were instead intended  "to avoid the valid restrictions

that [the Code] places upon Advertising Signs."  (Doc. 82-7 at 21).

The Defendants' Motion for Summary Judgment (Doc. 75 ) and the Plaintiff's Motion for

Partial Summary Judgment on the Issue of Liability  (Doc. 80 ) are pending. It is respectfully

recommended that the Defendants' Motion be granted, and that the Plaintiff's Motion be denied.

1

## II. REPORT

## A. BACKGROUND

During the period from May 1998 to February 1999, Melrose executed lease agreements with the owners of five Pittsburgh buildings.[1] Each lease granted Melrose the right to name the building and to construct and display signage on the building reflecting that name.[2] The leases, which extended over varying periods of years, did not limit the number of times or how often Melrose was entitled to change the building name.

In February 1999, Melrose filed applications for signage approval with the Zoning Administrator of the City of Pittsburgh ("the Administrator"). (Doc. 82-7 at 7). At that time, the sign size and shape specifications for building identification signs were more generous than those applicable to advertising signs. (Doc..76-11 at 1).

The application process went smoothly. The Administrator approved the name "RamSteiger" for the premises at 840 East Ohio Street. Staiger was the owner of the property, and "Ram" was his business's name. (Doc.76-12 at 5). The premises at 818 East Ohio Street

---

[1]Melrose contends that it had entered into similar agreements with respect to other buildings, but did not attempt to place signs on those buildings in light of the Defendants' denial of the five applications discussed here.

[2]The first lease granted Melrose naming rights to the premises located at 840 East Ohio Street from May 27, 1998 until June 30, 2013. (Doc. 82-5 at 30). On July 8, 1998, Melrose entered into a seventy-two month lease which granted Melrose the "authorization for property naming rights" for the building located at 568 Lincoln Avenue. Id. at 42-43. A third lease covering a fifteen year term was executed on February 9, 1999, for the building located at 818 East Ohio Street. Id. at 32. A fourth eighteen year lease gave Melrose the naming rights to premises located on West Carson Street (Doc. 76-19 at 2). Last, Melrose executed a twenty-seven year lease which granted it "exclusive rights and appurtenances for the naming and/ or renaming of the property [located at 57 Bates Street, Pittsburgh]." (Doc. 82-5 at 440).

were named "Caskey Limited" after a girlfriend of a Melrose officer. (Doc. 76-10 at 10). Melrose's application to name the West Carson Street premises the "Three Rivers Building" was approved, as was the request to name the premises at 57 Bates Street "The Cole Building." The Cole Building was named for the son of a Melrose officer. (Doc. 76-12 at 14). Melrose constructed and installed signs reflecting the assigned names.[3]

---

[3]The name "SSSP," which purportedly stood for South Side Parking Authority, an off-site business with which Melrose's President had a connection, was placed on signage erected on the building at 1025-33 Beaver Avenue. (Doc. 76-12 at 5). The record reflects that Melrose did not file a permit application for this sign.

Almost immediately after Melrose's initial name and sign applications were approved, an amended Code became effective.( See Doc. 82-2 ).[4]  Section 919.01.C of  the amended Code

---

[4]Section 919.01 of the Code  lists the purposes underlying the City Council's regulation of signage. The regulations were intended to:

1. Encourage sound practices with respect to size, spacing, illumination, type and placement of signs for the purpose of safeguarding, and enhancing properties in each of the various types of zoning districts;

2. Provide an environment that will promote the orderly growth and development of business in the City;

3. Protect public investment in public structures, open spaces and thoroughfares;

4. Promote the safety and welfare of the people at large;

5. Recognize the City's environmental attributes, system of parks, Greenway Program, Riverfront Plan, and public open spaces and the effect that signage can have on these features and programs;

6. Recognize the City's built environment, its significant architecture and cultural resources which provide the City with a sense of its history;

7. Recognize that the unique views and vistas offered by Pittsburgh's many hills, valleys, and rivers provide the City with a visual amenity which helps to attract residents, businesses, and visitors to the City;

8. Preserve and perpetuate uncluttered and natural views for the enjoyment and environmental enrichment of the citizens of the community and visitors hereto;

9. Enhance the Community appearance, reduce visual clutter and blight, and promote the recreational value of public travel and the economic development of the community;

10. Promote safety upon the streets and highways in the City;

11. Recognize that advertising signs are a legitimate advertising medium in the locations which neither lessen the visual attributes of the City through the placement of such signs, nor cause confusion, safety problems or lessen the ability to identify local businesses through visual clutter; and

12. Regulate advertising signs, or billboards, within the City in the interests of economic prosperity, civic pride, quality of life and general welfare of the people who reside in, are visiting, are employed in or conduct the business of the City.

distinguished among different types of signs, in relevant part, as follows:

2. **Advertising Sign** means a sign that directs attention to a business, commodity, service or entertainment, conducted, sold or offered:
(a) Only elsewhere than upon the premises where the sign is displayed; or
(b) As a minor and incidental activity upon the premises where the sign is displayed.

3. **Business Sign** means a sign that directs attention to a business, profession, or industry located upon the premises where the sign is displayed; to the type of products sold, manufactured, or assembled; and/or to the service or entertainment offered on such premises; except a sign pertaining to the preceding if such activity is only minor and incidental to the principal use of the premises.

4. **Identification Sign** means a sign used to identify the name of the individual or organization occupying the premises; the profession of the occupant, the name of the building on which the sign is displayed; or the name of the major enterprise or principal product or service on the premises.

Under the amended Code, as under the prior version, advertising signs, regulated pursuant to Section 919.02 of the Code, were subject to more rigorous requirements with respect to location, placement, size, and shape than were non-advertising signs, which were regulated pursuant to Code section 919.03.

Approximately one month after the last of the five buildings leased by Melrose was named and signage was erected, Melrose initiated proceedings to rename the buildings and amend the signage accordingly. (Doc. 82-6 at 3-17). Melrose submitted applications to the Administrator requesting that it be allowed to change the signage. Melrose proposed that the Cole Building be renamed "www.wehirenurses.com," that the SSPP and Caskey Limited

buildings be renamed "www.palegalhelp.com"and that the name of the RamSteiger Building be changed to "Baruch Atah Hashem," a Hebrew expression meaning "Blessed be God." He also submitted a signage application for the Three Rivers Building, but neglected to specify the new name.[5]

Before the end of March 2001, the Administrator notified Melrose that each of its name change requests had been denied because the proposed signs constituted advertising rather than business/building identification. On April 18, 2001, Melrose appealed the Administrator's decisions to the Board. The five cases were consolidated, and hearings were held on May 24 and June 21, 2001. The parties stipulated that the testimony and evidence produced in each individual case would be applicable to all. (Doc. 76-8 at 5).

On December 7, 2001, the Board issued five decisions denying Melrose's appeals. (Doc. 82-7 at 2-25). Rejecting Melrose's proposal that it be permitted to rename two of the buildings "www.palegalhelp.com," and another, "www.wehirenurses.com," the Board found that the proposed signs were not bona fide identification signs but were, instead, "in the nature of a creative plan or strategy of evasion to avoid the valid restrictions which Chapter 919 place[s] upon Advertising Signs." (Doc. 82-7 at 8, 21; Doc. 76-7 at 3).

The Board also rejected Melrose's right to change the name of and signage on one of the buildings to "Baruch Atah Ashem," concluding that what Melrose characterized as a "religious message" did not fall within the building identification definition, or any alternate provision of the Code. (Doc. 76-4 at 4). The Board invited further briefing on the constitutional implications

_____

[5]At the hearing before the Board, the President of Melrose, Alan Gochnour ("Gochnour"), testified that he intended, ultimately, to change the name of this building, too, to www.palegalhelp.com. (Doc. 76-12 at 89).

raised by this application. Melrose did not pursue this case at the Board level. The Board's fifth

decision addressed Melrose's application to change the name on one of the building signs

without designating the new name. Stating that "the Zoning Administrator should not have made

a decision or determination as to the subject application until it was completed . . ," the Board

remanded this case to the Administrator so that Melrose could submit an amended application.

(Doc. 76-6 at 3). Melrose did not re-apply.

On July 1, 2002, Melrose filed this action.


## B. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The mere

existence of some evidence favoring the non-moving party will not defeat the motion. There

must be enough evidence with respect to a particular issue to enable a reasonable jury to find in

favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A motion

for summary judgment will be granted where the materials in the record, if reduced to admissible

evidence, would be insufficient to satisfy the non-moving party's burden of proof at trial. Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986).


## C. MELROSE'S CONSTITUTIONAL CONTENTIONS

The essence of Melrose's dispute with the Defendants is straightforward. First, the Plaintiff contends that the terms of the Code do not restrict Melrose's right to name a building. [6] Second, to the extent that the Defendants argue that Melrose's right to display building identification signs is circumscribed by portions of the Code relating to advertising, that argument is precluded because the Defendants have repeatedly and preferentially permitted other corporate applicants to erect building identification signs that also advertise. [7] Accordingly, the Defendants' denial of its most recent renaming applications violated its First and Fourteenth Amendments rights.

[6]This argument is illustrated in the following exchange at the Board hearing:

Board Member Levine: Do you plan to change the name of the building from time to time?

Counsel for Melrose: We might from time to time.

Board Member Levine: And really, under your theory, there is no limit. Because any name that you might want to name it, you have the right to name it because you own that part of the building or at least -

Counsel for Melrose: Just as I can call my building Nernberg Building, 301 Smith Street Building, the Legal Services Building, or any other name that I want to put on it. Unless Heinz objects to me calling it the Heinz Building, I would have the right to name that building in any way I want.
If I want to name it after my great-grandmother or name it after - my wife's first name or anything else that I want to do, in short, yes, we have an absolute right to name the building any way we want, and especially under the ordinance, and that is the crux of the issue.

(Doc. 76-9 at 14).

[7]Melrose admits that its proposed signage fell within the Code's definition of an advertising sign. At the hearing before the Board, Gochnour was asked about his plan to name two of the five buildings "www.palegalhelp.com." He stated that "www.palegalhelp.com" was the name of a business enterprise that he had started by applying for the domain name, buying software, and talking to "a couple of lawyers." (Doc. 76-11 at 11-12). He confirmed that the proposed name bore no relationship to business conducted in the buildings where the signs were to be placed. Id. at 13. These signs were intended "to direct attention to the name of 'paralegalhelp.com.'" Id. at 12.

The court turns to these constitutional claims.

## 1. THE FIRST AMENDMENT CLAIMS

Melrose contends that in refusing to approve the signage applications, the Defendants infringed protected commercial speech.[8] Specifically, Melrose alleges that: (1) the Defendants' decisions were made with reference to an ordinance containing inadequate standards; and (2) to the extent that the ordinance did contain standards, those standards were arbitrarily applied. (Doc. 81 at1).

### a. The Central Hudson Test

The legal framework for assessing content-neutral restrictions on pure commercial speech was articulated by the Supreme Court in Central Hudson Gas & Elec. Corp. v. Public Service Commission of NewYork, 447 U.S. 557, 566 ( 1980).[9] According to Central Hudson, courts evaluating restrictions on commercial speech must determine whether: (1) the speech at issue concerns lawful activity and is not misleading; (2) the asserted governmental interest is

---

[8]For purposes of summary judgment, Melrose agrees that its desired building name signs constitute commercial speech. (Doc. 81 at 3). "Commercial speech, with its lesser protection, is at bottom advertising." Pruett v. Harris County Bail Bond,499 F.3d 403, 408 (5th Cir. 2007). Melrose also agrees that the definitions set forth in the Code are content-neutral (Doc. 81 at 9), and that its challenge to the ordinance is an "as applied" rather than a facial challenge. Id. at 4. An "as applied" challenge is "based on the idea that the law itself is neutral and constitutional in all fact situations, but that it has been enforced selectively in a viewpoint discriminatory way." McGuire v. Reilly, 386 F.3d 45, 62 (1st Cir. 2004).

[9]The Central Hudson framework is "substantially similar" to the test for time, place, and manner restrictions. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 554 (2001). The "time , place, and manner test," however, applies only where an ordinance restricts commercial and non-commercial speech. XXL of Ohio, Inc., v. City of Broadview Heights, 341 F. Supp.2d 765, 783 (N.D. Ohio 2004) (citing Cleveland Area Bd. of Realtors v. City of Euclid, 88 F.3d 382, 385-86 (6th Cir. 1996)).

substantial; (3) if the first two criteria are met, the regulation directly advances the governmental interest asserted; and (4) the regulation is more extensive than necessary to serve that interest. This test applies "to restrictions on commercial speech even in cases of alleged viewpoint discrimination." Eller Media Co. v. City of Oakland, No. C 98-02237, 2000 WL 33376585 *4 (N.D. Cal. Dec. 7, 2000) (citing Greater New Orleans Broadcasting Ass'n v. U.S., 527 U.S. 173, 184 (1999)). The parties do not discuss Central Hudson.[10] The record is, however, sufficient to allow the court to discuss and reach a conclusion regarding each of the relevant factors.

### I. Was the proposed signage unlawful or confusing?

First, the court must examine whether the sign content proposed by Melrose is unlawful or misleading. If it is either, the message is not protected by the First Amendment. See West Virginia Ass'n of Club Owners & Fraternal Serv., Inc. v. Musgrave, 512 F. Supp.2d 424, 440 (S.D. W.Va. 2007). Although the signage proposed by the Plaintiff is not illegal, it is, in the court's view, misleading.

Melrose insists that the proposed signs constituted building identification. At the same time, however, it admits that all but one of these signs were intended to direct readers to business enterprises having no connection with the buildings on which they were to appear, and could be changed at will. The reality is that the signs with content limited to web addresses could not have been and, in fact, were never intended to be interpreted by the public as anything other than advertising. Melrose does not suggest how the public could possibly have understood

---

[10]It would not be unfair to say that the parties' approach to this case was to throw every First Amendment test (except Central Hudson) and standard of review into a sieve, and wait for the court to sift out what was irrelevant.

that the proposed signs were intended to identify a building.[11]  This is especially problematic

where Melrose sought to place *identical* signage on two buildings, and intended to give the same

name, "www.palegalhelp.com," to a third.  Putting the same web address on three buildings

would not have promoted building identification, and would have negated any association

between the name and a particular location.[12]

Given the confusion inherent in giving three buildings the same name, the Motions before

the court in those cases might well be decided with reference to the  first <u>Central Hudson</u> factor,

on the ground that the misleading nature of the proposed speech removes it from the confines of

First Amendment protection.  The record, however, establishes that Melrose's signs were

ultimately vetoed, not because they were misleading, but because they contained advertising.  In

the interest of evaluating fully the arguments raised by the parties - especially those involving

unequal treatment - the court will examine the remaining <u>Central Hudson</u> factors.


ii. **<u>Was the City's Interest in Denying the Melrose Applications Substantial?</u>**

The second <u>Central Hudson</u> prong requires that the court determine whether the City's

interest in prohibiting Melrose's signage is substantial.  There is no doubt that the regulatory

interests set out in Section 919.01 of the Code are "substantial" for purposes of the First

---

[11]The Hebrew phrase proposed in one of the Melrose applications cannot be understood to constitute advertising and, as the Board recognized, Melrose's request to put the phrase on a sign should not have been denied on that basis. It is no more reasonable , however, to argue that the language was intended to identify a building.

[12]"Melrose argues that  "[i]t is no more misleading to name a warehouse building www.wehirenurses.com than to name a sports venue 'Mellon Arena' or a concert facility 'Chevrolet Amphitheater.'" (Doc. 81 at 4 n.4). Melrose does not, however, describe the nature of the confusion likely to be generated by the latter names, and does not point to evidence that actual confusion has occurred.

Amendment.  See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507- 08 (1981) (finding it too late to contend that twin goals of the ordinance -  traffic safety and the appearance of the city - were not substantial) (footnote and citations omitted); see also City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 806-07 (1984) (concluding that visual assault on citizens . . .  presented by an accumulation of signs posted on public property were  "a significant evil within the City's power to prohibit.").

### iii. Did Denial of Melrose's Signage Applications Directly Advance the Interests Asserted?

Although it does not say as much, Melrose centers its challenge to the City's disposition of its applications on the third step of the Central Hudson analysis.  Melrose does not contend that the City lacks authority to regulate signage, nor does it contend that limitations on the size and location of signs fail to advance important governmental interests.  Instead, Melrose argues that the City cannot reasonably contend that its interests were directly advanced by prohibiting the signage proposed by Melrose, because, at the same time that it denied the Melrose applications, it permitted larger more powerful corporations to display functionally identical signage.

The law is clear that "a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that the restriction imposed will alleviate them to a material degree."  Edenfield v. Fane, 507 U.S. 761, 770-71 (1999).  The government may make this showing by "reference to studies or anecdotes, or, in some instances, history, consensus, and common sense."  W. Va. Ass'n of Club Owners, 512 F. Supp.2d at 443 (citing Lorillard Tobacco Co., 533 U.S. at 771.).  Plaintiff does not dispute that

sign proliferation within the City poses genuine harm.[13]  The question, then, becomes whether the restriction on speech imposed on Melrose was intended to mitigate that harm or was intended instead to silence Melrose in particular.

The Defendants argue that the criteria articulated in the Melrose decisions were directed at mitigating the problem of sign pollution, and that the underlying decision to deny the Melrose application was distinguishable from decisions in the other cases cited by Melrose. In the three decisions addressing Melrose's request to display signs consisting of a web address, the Board found the distinction between advertising and nonadvertising signs to be "paramount."  (Doc. 76-5 at 5). It wrote:

> Pursuant to Chapter 919, City Council delineated regulations governing the location, placement, size and shape of advertising signs and other signs, classified as Nonadvertising signs. Pursuant to Chapter 919, and particularly §919.02, City Council placed greater restrictions on the location, placement, size and shape of Advertising signs as opposed to § 919.03 (Nonadvertising signs). Code §919.02 permits Advertising signs only in the AS-O zoning district, subject to compliance with applicable regulations. Pursuant to § 919.03, Nonadvertising signs . . . are not subject to the same stringent requirements pertaining to their location, placement, size and shape . . . .

Id. at 5-6.  The Board noted that the signs proposed by Melrose and the signs approved in the cases of Heinz Field and PNC Park, for example,  have an "advertising aspect."  Id. at 6.  All

---

[13]While the Melrose cases were pending, the City Planning Commission submitted a Report and Proposal to the City Council dealing with limits on the size and location of various types of signs throughout the City. The report noted that the "civic and architectural integrity of the Pittsburgh skyline is threatened by a growing demand to place business and identification signs with corporate names, slogans and logos on downtown buildings, taking advantage of the growing regional and national exposure of the skyline. . . Pittsburgh's neighborhood vistas are also threatened . . . by the proliferation of large business and identification signs that overwhelm their host building and degrade the civic nature of the building's district and neighborhood." (Doc. 82-7 at 31).

have "a commercial context but . . . no apparent relationship to a product manufactured, service rendered or other activities or work carried out at a particular location." Id. Despite the fact that all of these signs fell within the Code's definition of advertising, the Board found that the signs for Heinz Field and other public facilities "inten[ded] to substantially identify the building and location with a given name for the information of the public." Id. In contrast, Melrose's proposed signage was intended "primarily to utilize the location as an advertising vehicle." Id. Categorizing a particular sign as an advertising sign or a building identification sign was, according to the Board, a matter "of degree based on the weight and interpretation of the evidence presented." Id. In differentiating between the two, the Board declined to make a bright line distinction.

Instead, the Board identified criteria [14] that had to be present before a sign with an advertising element could be considered a building identification sign: 1) the sign must "establish a specific destination point that will be generally recognized by the public as being at a set geographical location"; 2) there must be "evidence of intended longevity of the sign adequate to sustain the designated point concept"; 3) "the owner of the facility or a principal long term space user . . . should be in control of the destiny of the sign." Id. The Board stated that failure to adhere to these criteria:

> would thwart the intention of Council reflected in Code §§919.01A.11 and 12 which "recognize that advertising

---

[14]These criteria were first articulated by the Board in an August 15, 2001 Interim Decision in Zoning Case 85 of 2001, the matter involving construction of signage at Heinz Field. (Doc. 82-8 at 10). This Interim Decision contained an additional criterion that was not included in the five Melrose decisions. In the Interim Decision, the Board wrote that in order to be considered an identification sign rather than an advertising sign, the location on which it is placed "must be important to or of interest to a material segment of the public whether the designated facility is one of culture, art, architecture, sports, office, business or other commercial or nonprofit uses. Id. at 11.

> signs are a legitimate advertising medium to be placed
> in the locations which neither lessen the visual attributes
> of the City through the placement of such signs, nor cause
> confusion, safety problems or lessen the ability to identify
> local businesses through visual clutter; [and to] regulate
> advertising signs or billboards within the City in the
> interests of economic prosperity, civic pride, quality of
> life and general welfare of the people who reside in, are
> visiting, are employed in or conduct business in the City."

Id.

While conceding that the Code does not restrict a property owner's right to select a

building name, the Board held that when a building identification *sign* conflicts with the City's

proper regulation of signs, "the Board is obligated to consider the intention of City Council in

formulating Chapter 919 of the Code in its entirety."[15]  Id. at 7.  The Board found such a conflict

in the Melrose cases because: (1) the sign content was limited to web addresses for profit-making

ventures; (2) the proposed name for the building had  "no relationship to the owner or to any

---

[15]Melrose argues that because the Code's definition of "building identification signs" is broad enough to cover the proposed names, it is not necessary to look beyond this definition to resolve this matter. Here, where the Plaintiff has explicitly recognized the advertising effect of its signage, focusing on only one section of the Code would violate a cardinal rule of statutory construction: "Every [ordinance] must be construed, if possible, to give effect to all of its provisions." 1 Pa. Const. Stat. Sect. 1921(a). A number of other presumptions also inform the court's analysis. Under Pennsylvania law:

> [I]t is presumed that the legislators, or council members
> do not intend to violate the Constitution of the United
> States or of this Commonwealth. Secondly, it is presumed
> that the legislators intend to favor the public interest as
> against any private interest. Third, there is a strong
> presumption in favor of the constitutionality of
> legislative acts, including municipal legislation. Fourth,
> the title of the law may also be considered in the
> construction and any other title, part, article, chapter,
> section or other division may be used to aid in construction.
> Lastly . . . the Ordinance at issue is to be liberally construed
> as to effectuate its objects and promote justice.

Brown v. City of Pittsburgh, No. 06-393, 2008 WL 558716 * 16 (W.D. Pa. Feb. 22, 2008) (citations to Pennsylvania case law omitted).

tenant [or enterprise located] within the building;" (3) the sign was intended to direct readers to a for-profit website business; (4) neither the owner nor any principal tenant of the building exercised control over the sign or its content; and (5) there was no indication that the name assigned to the building would remain in place for any length of time. Id. "[T]he basic purpose of [an] 'identification sign for a building' that is - ongoing public knowledge thereof by observation of a sign, [is] highly inconsistent with the transfer of the building identification rights and the signs reflecting same to a third party who may change such identification for commercial purposes when and so often as it desire[s]." Id. at 8.

The Board resolved the tension between the advertising and building identification components of the Melrose signs as follows:

> [T]he proposed sign . . . is not a bona fide Identification
> Sign . . . but [is] rather in the nature of a creative plan or
> strategy of evasion to avoid the valid restrictions
> which [the Code] placed on Advertising Signs.
> To find otherwise would be to open the door to
> a proliferation . . . of Advertising Signs disguised
> as Building Identification Signs, all beyond the
> limitations and regulation imposed by . . . the Code
> on Advertising Signs. Such [an] outcome would be
> completely foreign to the structure and intent of
> the Code . . . .

Id. at 7. The Board concluded that any other outcome would have contravened the facts.[16]

---

[16]In the deposition of Clifford B. Levine, a Board member participating in the Melrose appeals, the following exchange took place:

> Q: What did the applicant say the purpose of the sign was for? What did it say on the
>     application? Does it say advertising?
>
> A: It doesn't matter what the applicant says it is.
>
> Q: Let's look [at the next Exhibit]. What was the purpose for the sign in that application?

The Court finds that the Defendants, in distinguishing between Melrose's proposed signs and other signs that also fell within the Code definition of advertising signs, did not act arbitrarily or out of animus for Melrose or its message. They sought instead to ensure that advertising in the City remains subject to the location and sign strictures set out in other sections of the Code, and that signs denominated building identifications signs promote a link between the  name and a place or building that will last long enough that the public can make and benefit from that

---

> A: Excuse me. Is this a different case that you just handed me? The lettering is PALegalhelp.com. So you have [this name] on two separate buildings. Again, this goes to my point that we're not stupid, we know that these are not for purposes of pure identification. It's really for the purposes of communicating that Web site to the world.
>
> Q: Are you saying that the Law and Finance - there can't be two buildings downtown named Law and Finance Building?
>
> A: In the context of what was being done here with the control of the applicant to change the frontage and change that sign . . . and knowing that there were five of these, we came to the conclusion and set out in the opinion that this was not going to be a business, that this was no different than having an advertising sign.

(Doc. 82-4 at 29 -30). Levine also stated:

> A: We did not believe that was - first of all, let me just say there were three members on the zoning board. We're not stupid and we can see in our view this was a sham. What was being proposed here was a sham. If you could see the buildings, you could see the signage . . . .
>
> Q:  I'm only asking you about -
>
> A:  It's in the context . . .  We see five cases that came in for extremely large signs on basically old warehouse buildings that were prominently located near highway systems. That seemed to be the scheme to some extent with these signs. . . .

Id. at 27.

association.[17]  Association between place and name is the essence of building identification.[18]

Simply saying that a sign is a building identification sign does not make it so. This is true despite

the Plaintiff's argument  that the building identification definition, standing alone, was vague.

Vagueness in the definition of building identification was irrelevant to Melrose's as applied

challenge because a different provision of the Code - the definition of an advertising sign - was

crystal clear, and was applicable to Melrose's applications proposing that web addresses be

approved as building names.  Moreover, procedural safeguards were in place to review the

decisions of the Administrator, and were effective in remedying errors in the Administrator's

decision regarding the Hebrew blessing and the case in which no building name was specified.

The record establishes in the general period of time in which this case arose, the Board

was aware of the issues posed by naming rights, and recognized that those rights could impact

the City's ability to regulate advertising.  The exercise of corporate naming rights at sports and

---

[17]Melrose argues that it could have established this link simply by adding the word "building" to the content of its signs.  The argument is disingenuous.  Naming three structures the "www.palegalhelp.com  Building" does nothing to help the public navigate the City streets or find a business that they are interested in patronizing.  From an identification standpoint, even the revised name would generate confusion.

[18]Although they address First Amendment issues raised by exceptions to a general signage ban, the Third Circuit Court of Appeals decisions in Rappa v. New Castle County, 18 F.3d 1043 (3d. Cir. 1994), and Riel v. City of Bradford, 485 F.3d 736 (3d Cir. 2007), underscore the important relationship between signage and location.  In Rappa, the Court held:"When there is a significant relationship between the content of particular speech and a specific location, the state can exempt speech having that content from a general ban so long as the exemption is substantially related to serving an interest that is at least as important as that served by the ban."  Id. at 1066 (footnote omitted).  The Court explained that the state could establish the requisite relationship between speech and location by showing that "a sign better conveys its information in its particular location than it could anywhere else."  Id. at 1065.  The context specific rule in Rappa was applied in Riel to permit a speech ban exemptions for on-site advertising.  "Like an address sign, a sign denoting the name and profession of a building's owner or occupant better conveys its information in the location than it could anywhere else."  485 F.3d at 750. The Court in Riel also upheld building identification signs, writing, "[T]his is precisely the type of context-specific exception that was allowed in Rappa ."  Id. at 751.

other facilities throughout the country and the sums paid to obtain those rights attest to the commercial value inherent in linking a corporate name to a location visited or seen regularly by large numbers of potential consumers. The Board was thus convinced that it was necessary to articulate criteria for differentiating between advertising and identification. "Otherwise," as Board member Levine testified, "you could have advertising everywhere." (Doc. 82-3 at 26). According to Levine, "[the] Board ultimately ended up . . . with some . . . judicial analysis where [it] laid out certain criteria to help define how [it] would interpret identification and how [it] would interpret advertising and how [it] would deal with naming rights." ( Doc. 82-4 at 5). Not every set of facts could be covered in the Code. The Board recognized that "[e]very situation is different. The law is such that every factual situation will come up slightly different. . . . [T]he more rules you try to put . . . there would be another exception, another case that would have to balance between two competing sections." Id. at 21.

The record supports the court's finding that the Board's decisions upholding the denial of Melrose's signage applications directly advanced the City's substantial interests. The criteria used to evaluate the Melrose cases were rational and relevant to the harms addressed. Limiting building identification in accordance with these criteria can reasonably be expected to reduce the number of large multiple signs placed on City buildings, and to restrict what are, in reality, advertising signs to locations and sizes contemplated by the Code. The court is, therefore, satisfied that the restriction on Melrose's speech satisfies the third prong of the Central Hudson test.

### iv. Was the Restriction Overly Broad?

The Supreme Court does not require that the government's regulation of commercial speech be the least restrictive possible. Rather, it requires that the restriction be reasonable and in proportion to the government's interest. Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989).

In light of the court's findings with respect to the first three parts of the Central Hudson test, it need not revisit whether the restriction on Melrose's speech was reasonable. The court thus focuses on whether, in light of the signage-related interests asserted by the City, some narrower restriction was required. The Plaintiff does not suggest and the court cannot imagine what lesser burden on commercial speech might have been imposed. Essentially the Board held that all advertising signs - except those few that have an advertising component but meet the building identification criteria outlined in the Board's opinions - must conform to the Code provisions governing advertising. The Plaintiff states that the five buildings on which it planned to display signs are located in zones where advertising is permitted. (Doc. 87 at 7 n.11). Assuming that this is accurate, the only thing that the denial of its signage applications requires Melrose to do is place its messages on smaller - and perhaps fewer - signs on the identical buildings. It is free, moreover, to place its messages anywhere in the City that advertising is allowed. Melrose may also display building identification signs, so long as the signs are consistent with the criteria articulated in the Board's decisions.

The fourth factor of the Central Hudson test has been satisfied, meaning that, overall, the limits places on the Plaintiff's right to display signs containing commercial speech pass muster under the First Amendment.

## 2. **THE EQUAL PROTECTION CLAIMS** [19]

Melrose argues that the Defendants, in allowing other corporations to use advertising in exercising their naming rights, violated its right to equal protection under the Fourteenth Amendment to the United States Constitution.[20]  According to Melrose, we must apply strict scrutiny in evaluating this claim because the Defendants have transgressed its "fundamental right" to commercial speech.  The Supreme Court has clarified on several occasions that strict scrutiny does not apply in the context of commercial speech. <u>See</u>, e.g., <u>Glickman v. Wileman Bros. & Elliott, Inc.</u>, 521 U.S. 457 (1997).  "Furthermore, if the regulations in question have passed constitutional muster under the commercial speech test of <u>Central Hudson</u>, they likewise

---

[19]The analysis of Melrose's equal protection claims made pursuant to Article One, Section Twenty-Six of the Pennsylvania Constitution is the same as the analysis governing claims made pursuant to the Fourteenth Amendment of the United States Constitution.  The court's disposition of the federal equal protection claims applies with equal force to claims made under the Pennsylvania Constitution.  <u>Kramer v. Workers' Comp. Appeal Board</u>, 883 A.2d 518, 532 (Pa. 2005).

[20]Melrose also raises a Fourteenth Amendment procedural due process claim which does not merit extended discussion.  He argues that the fact that Defendant Levine was on the planning board helping to draft code provisions should preclude him from adjudicating disputes arising under the Code. At the time of the Melrose hearing, Defendant had served jointly on the planning commission and on the Board from 1994 through 2006. (Doc. 82-3 at 3) . Melrose does not explain how Levine's role in drafting the Code prevented him from applying its terms fairly. Judges are often instrumental in drafting local and Federal Rules, but are not precluded from applying those rules in cases that come before them. Melrose did not ask that Levine recuse himself, and does not point to anything in the record to raise even a wisp of a suggestion that Levine acted improperly or unfairly in evaluating its applications. It would indeed be difficult to argue that there would have been a different outcome in the Melrose appeals had Levine not participated, given that the other two Board members were in accord with Levine. Melrose's contention that Levine gave improper help to others whose appeals were denied - particularly those in the Heinz case - is belied by the record. Heinz contacted Levine after its appeal was denied to ask what options were open to it in having signage erected for the Great Hall at Heinz Field. Levine replied that Heinz could appeal the Board's denial, or could seek to have the Code amended. <u>Id</u>. at 35. He then made several proposals for amendment. The record does not show that these avenues of address were not open to Melrose. More fundamentally, the record does not show that Melrose ever contacted Levine or any other Board members following the denial of its appeals, or that it sought advice regarding how its goals might be accomplished. In these circumstances, it is difficult to credit Melrose's contention that it received inferior treatment.

pass the appropriate equal protection analysis." <u>American Federated General Agency, Inc. v. City of Ridgeland,</u> 72 F. Supp.2d 695 (S.D. Miss. 1999) (<u>citing</u> <u>Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico</u>, 478 U.S. 328, 343 n.9 (1986)) (holding it apparent from the court's discussion of the First Amendment, "particularly the third and fourth prongs of the <u>Central Hudson</u> test that the appellant can fare no better under the equal protection guarantee of the Constitution.").

### III . <u>CONCLUSION</u>

For the reasons set out above, it is recommended that the Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability (Doc. 80) should be denied, and the Defendants' Motion for Summary Judgment (Doc. 75) should be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

*/s/ Amy Reynolds Hay*
United States Magistrate Judge

Dated: 22 May, 2008

cc: Hon. Joy Flowers Conti
Counsel of Record via Electronic Filing